This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**IN THE MATTER OF THE WRONGFUL DEATH ESTATE OF BRANDON LUCERO, Deceased.**

**CRYSTAL LUCERO,**

    Petitioner-Appellee,

**v.**                                                                 No. 31,625

**TYLER ARAGON,**

    Respondent-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Nan G. Nash, District Judge**

Duhigg, Cronin, Spring & Berlin P.A.
Nancy Cronin
Albuquerque, NM

for Appellee

Will Ferguson & Associates
Jesse Quackenbush
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**BUSTAMANTE, Judge.**

Tyler Aragon (Father) appeals from the district court's order granting Crystal Lucero's (Mother's) motion to declare rights, status, and other legal relations of Father under the wrongful death act and for declaratory relief. [RP 182] The order is supported by the district court's findings and conclusions. [RP 174] Father contests several of the district court's findings and conclusions and claims that the district court erred in failing to enter other findings he had requested. [DS 4-18] Father raises one issue, contending that the district court erred in concluding that Father was not eligible as a statutory beneficiary to settlement proceeds from the wrongful death claim. [DS 18]

The calendar notice proposed summary affirmance. [Ct. App. File, CN1] Mother filed a memorandum in support [MIS], and Father filed a memorandum in opposition [MIO]. [Ct. App. File] Upon due consideration, we affirm.

**DISCUSSION**

As we discussed in the calendar notice, we are deferential to facts found by the trial court, but review conclusions of law de novo. *Perry v. Williams*, 2003-NMCA-084, ¶ 12, 133 N.M. 844, 70 P.3d 1283 (citing *Strata Prod. Co. v. Mercury Exploration Co.*, 1996-NMSC-016, 121 N.M. 622, 627, 916 P.2d 822, 827).

"[P]roof of natural-parent status is not necessarily sufficient for recovery under the wrongful death statute." *Dominguez v. Rogers*, 100 N.M. 605, 609, 673 P.2d 1338, 1342 (Ct. App. 1983). In *Dominguez*, we warned future litigants that this Court "would take a narrow view of a self-interested individual who chooses to assert a parental status only when it becomes financially profitable to him following the death of a small child." *Williams*, 2003-NMCA-084, ¶ 16 (internal quotation marks and citation omitted).

"Abandonment is defined by the outward behavior of the parent as perceived and interpreted by others; there is no inquiry into the parent's concealed and unexpressed intentions." *Roth v. Bookert*, 119 N.M. 638, 648, 894 P.2d 994, 1004 (1995). "Abandonment consists of conduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to the child, leading to the destruction of the parent-child relationship." *Id.* (internal quotation marks and citation omitted). "No specific intent to disregard parental obligations is involved." *In re Adoption of Doe*, 100 N.M. 764, 767, 676 P.2d 1329, 1332 (1984) (internal quotation marks omitted). "The only intent involved is the purposely engaging in conduct which implies a conscious disregard of parental obligations." *Id.* (internal quotation marks and citation omitted). "The typical kinds of conduct which constitute abandonment are the withholding of parental presence, love, care, filial affection and

support and maintenance." *Id.* (internal quotation marks and citations omitted).

"Because we are dealing with the extinguishment of [the f]ather's property interest in a statutory right of recovery that was not a traditional incident of the parent-child relationship, there is no reason to employ the heightened burden of proof applicable to formal termination of parental rights proceedings." *Williams*, 2003-NMCA-084, ¶ 11. Thus, in this case, Mother bears the burden to establish the facts that support Father's abandonment by a preponderance of the evidence. *See, generally* UJI 13-304 NMRA.

In the memorandum, Father continues to argue that since he and Mother were young when she became pregnant, he thought Mother would put the twins up for adoption or terminate the pregnancy. [RP 158-62; MIO 3] When they were born medically fragile, Father continues to argue that when the twins were born medically fragile, he never intended to abandon them if they lived and if they were his children. [MIO 3-4] He contends that he stayed away because he did not want to get attached if they died. [Id.] Father also continues to claim that he stayed away because he could feel that Mother and Mother's family were hostile to him. [Id.] Father points out that he mentally prepared himself for fatherhood and faithfully paid child support after his paternity was established and he was ordered to do so. [MIO 5] Father also points

out that he visited the twins in the hospital after they were born, and that he visited Brandon in the hospital before Brandon died. [Id.]

Father further argues that he did not fully bond with Brandon because the time period between Brandon's birth and death at sixteen months was too short, shorter than the factual scenarios presented in the cases relied upon in the calendar notice. [MIO 10] He asserts that he "made efforts" to establish a parent/child relationship in pre-birth family meetings and that his mother and sister assisted and visited Mother before and after the twins were born. [Id.] Father reiterates that after the twins were born, he was repeatedly advised that the twins would die, and therefore he did not fully bond within months of their birth in the face of such "emotionally and psychologically devastating facts." [MIO 11] Father asserts that he held his son in the hospital when it became less likely that the child would die. [Id.] He paid child support after paternity was established. [Id.] Mother harassed Father and his new girlfriend after the twins were born, which caused Father to remove himself from Mother's proximity and the situation. [Id.] Father argues, essentially, that Mother is not blameless since CYFD temporarily removed the twins from Mother's custody for unsafe conditions there and without his knowledge or consent. [Id.] He also points out that Mother was arrested for DWI. [MIO 11-12] Father further asserts that he went to the hospital when he heard the news of the accident, comforted Brandon, but

6

left due to Mother's family's hostility. [MIO 13] Father points out that he went to Brandon's funeral and grieved by the casket. [Id.] Father argues that his own young age and his contentious and litigious relationship with Mother during Brandon's brief life provided obstacles to his fully bonding with Brandon prior to his death at sixteen months. [Id.]

In contrast, however, Mother presented evidence that Father broke off contact with her shortly after she discovered that she was pregnant; Father and his family did not attend the baby shower; Father did not help with any arrangements for the birth; and Father did not visit Mother during her medically complicated pregnancy. [RP 164-170] After the twins were born, Father never requested visitation, never held the twins, and he was never involved in their care in any way. [Id.] Mother further presented evidence that after paternity was established almost a year after the twins were born, Father never signed the birth certificates of the twins although ordered to do so; Father never established a relationship with either twin; Father never held Brandon; Father visited Brandon for twenty minutes before he died; Father did not help pay for Brandon's funeral; and Father never demonstrated a willingness to establish or accept a loving responsibility for Brandon. [Id.]

The district court found that Father had provided no evidence that he fulfilled any of the legal obligations of a parent except for paying child support once ordered

to do so. [RP 174-81] The district court noted that there was no evidence that Father was prevented from performing any of the acts by anything beyond his control. [Id.] The district court further found, from the time Brandon was born until his death at sixteen months, Father chose not to seek custody of him at any time, chose not to provide any meaningful level of care for his son, chose not to perform any form of emotional or voluntary financial support for his son, chose not to accept any legal responsibility, chose not to give any type of moral or spiritual guidance for his son, and chose not to provide a home or any other form of shelter and security for his son. [Id.] Because Father consciously disregarded the obligations owed to Brandon, he never developed any type of parent-child relationship and therefore no disintegration of the relationship was possible. [Id.] The district court concluded that because Father consciously failed to meet the responsibilities of a father during Brandon's lifetime, he is not entitled to claim that status in the wrongful death proceedings, and he is not entitled to receive any of the wrongful death proceeds of the settlement. [Id.]

While Father contends that Mother's evidence merely concentrated on his deficiencies as a father in areas not required by the statute [MIO 9], the district court's findings and conclusions clearly focus on how the evidence presented showed Father's abandonment of the essential attributes of parental responsibility for Brandon. While Father argues that the district court should have resolved the parties'

8

conflicting assertions in his favor [DS 15-18], we defer to the fact finder, here the district court judge presiding over a bench trial, to resolve the conflicts in the evidence, to weigh the facts, and to determine the credibility of the witnesses. *Buckingham v. Ryan*, 1998-NMCA-012, ¶ 10, 124 N.M. 498, 953 P.2d 33 ("[W]hen there is a conflict in the testimony, we defer to the trier of fact."); *see also Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177 (stating that, "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached"); *and see id.* ("Additionally we will not reweigh the evidence nor substitute our judgment for that of the fact finder.").

**CONCLUSION**

We hold that Mother sustained her burden of showing that Father abandoned Brandon prior to his death by a preponderance of the evidence. Moreover, we hold that the district court's findings are supported by substantial evidence and that the district court's findings support the district court's conclusion that Father is not entitled to receive any of the proceeds of the wrongful death settlement. Accordingly, we affirm.

9

**IT IS SO ORDERED.**

_____

**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____

**JAMES J. WECHSLER, Judge**

_____

**JONATHAN B. SUTIN, Judge**