This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                          **No. A-1-CA-35012**

**CODY SCHATTSCHNEIDER,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF ROOSEVELT COUNTY**
**Stephen K. Quinn, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Elizabeth Ann Ashton, Assistant Attorney General
Albuquerque, NM

for Appellee

L. Helen Bennett, P.C.
Linda Helen Bennett
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**BOHNHOFF, Judge.**

{1} Defendant Cody Schattschneider appeals from his conviction, pursuant to a jury verdict, of intentional child abuse resulting in great bodily harm. Defendant raises five issues on appeal: (1) the State committed prosecutorial misconduct by using inflammatory hypothetical scenarios and referring to injuries not caused by the alleged abuse by Defendant; (2) the State's expert witness improperly testified as to the cause of Child's injuries; (3) the district court erred in instructing the jury regarding intentional but not negligent child abuse and by including "failure to act" in the jury instruction that defined intentional conduct; (4) the State failed to present sufficient evidence that Defendant caused Child's injuries; and (5) a new trial should be ordered because of cumulative error and an incomplete record. We affirm the district court on all of these issues.

**FACTUAL BACKGROUND**

{2} Amanda Kaberlein (Mother), the mother of four-month old Leon M. (Child), and Defendant lived together at Defendant's grandmother's house in Portales, New Mexico. On December 19, 2012, Mother left Child in Defendant's sole care while she went to work. When Mother returned from work Defendant informed her that Child had fallen off the couch and onto the floor between the couch and a baby toy exerciser. That night Child seemed to be acting normally and Mother was not

2

concerned about Child's health at that time. The next morning Mother again left for work, leaving Child in the care of Defendant.

**{3}** Mother returned from work five hours later and Defendant told Mother child was still sleeping. When Mother went to check on Child she noticed he had thrown up and that he could not move his right arm. Mother took Child to the local hospital where he was air-lifted to a hospital in Lubbock, Texas due to his critical injuries. Upon arrival at the Lubbock hospital, the medical team evaluated Child and observed bruising on both sides of his face, his ear, and inside his mouth; swelling on the right side of his head; a skull fracture; bleeding around the brain; a fracture above the right elbow; and retinal bleeding. Child underwent lab tests, x-rays, and MRI and CT scans. Physicians and neurosurgeons monitored Child's condition for two days, at the conclusion of which Child was approved to be discharged.

**PROCEDURAL BACKGROUND**

**{4}** On February 22, 2013, a grand jury indicted Defendant on charges of child abuse resulting in great bodily harm, in violation of NMSA 1978, Section 30-6-1(D) (2009).

**{5}** At the beginning of Defendant's one-day trial on January 29, 2015, the State made clear that it was alleging only intentional child abuse and not negligent child abuse (requiring proof that a defendant acted with reckless disregard for the safety and

health of the child, *see* § 30-6-1(A)(3)). During the State's opening statement the prosecutor described Child's injuries as "a broken arm, broken ribs, bruises on the sides of his face, skull fracture, he had swelling to his brain, he had bleeding in his brain, and he had hemorrhaging in his eyes." Defense counsel objected to the reference to the broken ribs and moved for a mistrial, because Child's broken ribs were caused by a different incident. The district court denied the motion. During the State's direct examination of expert witness Dr. Patti Patterson, the prosecutor asked her about Child's rib fractures, and she indicated that they were healing rib fractures.Defense counsel again objected to the reference to the rib fractures; the district court instructed the State to lay a foundation but the prosecutor elected to move on to his next area of questioning.

{6}     Dr. Patterson had participated in the evaluation and treatment of Child when he arrived at the Lubbock hospital. The district court qualified Dr. Patterson as an expert in child-abuse pediatrics. Dr. Patterson testified that, in her opinion, Child's injuries were serious, could have resulted in death, and were consistent with child abuse. Dr. Patterson further testified that other circumstances that could account for Child's injuries would be falling from a great height (several stories) onto a hard surface or a car accident. No evidence was presented that Child was in a car accident or fell from a great height. Dr. Patterson then rejected the possibility that Child's injuries could

4

have been caused by a short fall from a couch to a hard surface. Defense counsel did not object to this testimony.

{7}     When asked if Child's elbow fracture was the kind of injury that looked like the bone had been crushed, pulled apart, or snapped, Dr. Patterson responded that it looked like the bone had been twisted. Defense counsel objected and asked that Dr. Patterson's response be struck, and the district court overruled this objection. When asked by the prosecutor if she trains doctors to find child abuse, Dr. Patterson responded that she does not and that she teaches how to identify red flags that would indicate a need for further work up; she further stated that "I readily admit sometimes it's difficult . . . we never want to accuse a family falsely, but also at the same time we do not want to leave a child in a dangerous situation."

{8}     During Dr. Patterson's cross-examination, defense counsel suggested that Child's injuries were the result of an underlying condition, such as rickets or Von Willebrand disease. Defense counsel asked Dr. Patterson if rickets could cause skeletal deformities to which Dr. Patterson responded, "Yes." However, on re-direct Dr. Patterson testified that she saw no problem with Child's bone formation, Child did not have rickets, rickets would not cause a skull fracture, and Child did not have Von Willebrand disease. The prosecutor asked Dr. Patterson, "There's no medical

condition you are aware of that causes both the bleeding and the broken bones." Dr. Patterson responded, "That's correct."

{9} The prosecutor then asked Dr. Patterson if she observed anything in Child's MRI or CT scans that would lead her to believe that Child had a problem with bone formation, if the injuries were a result of poor nutrition or other than child abuse, or if she was aware of any other diagnosis that could explain the totality Child's injuries. To all three questions Dr. Patterson responded, "No." Defense counsel objected to this line of questioning by the prosecutor, but the district court overruled his objection. Dr. Patterson was then excused.

{10} A portion of Dr. Patterson's testimony was never recorded due to technical issues. There is no recording for approximately twenty-six minutes, from 9:56:30-10:22:00. However, according to the transcript log, from 10:01:19-10:22:23, the court went off the record and the jury left the courtroom; we therefore assume that during this period the district court took its morning break. Defendant claims that during this gap in the record the prosecutor "presented the scenario that Leon was yanked and thrown 'against a wall' as its theory of the case," thereby inflaming the jury and prejudicing Defendant. Defendant claims that during this same period during which the trial was not being recorded Dr. Patterson testified "as to the cause of Leon May's injuries definitively being child abuse."

{11}     Mother then testified she left Child in the care of Defendant while she was at work on December 19 and 20, 2012. Mother stated that when she returned from work on December 20, Child was still sleeping, not moving his right arm, and threw up when she picked him up. Mother testified that she immediately took Child to the hospital. Defense counsel asked Mother if her other children play rough with Child and Mother responded that her other children pinch Child's cheeks and can sometimes cause "finger bruises" on his face.

{12}     Defense counsel then asked Mother what day Child was admitted to the hospital and Mother responded that Child was admitted on the December 20 and discharged on December 26. She stated that Child was approved to be discharged on December 22 but that the doctor did not release patients on weekends. Mother's parents, who were Child's foster parents, choose to wait until after Christmas to take Child home and picked Child up on December 26. Mother then testified that Child does not suffer from a bleeding disorder and has not had any additional broken bones or skull fractures since the incident.

{13}     Officer Chris Williams was the last witness to testify. Officer Williams interviewed Defendant following the incident. Officer Williams stated that Defendant was under a large amount of stress because he was going through a divorce and had lost his job. The prosecutor asked Officer Williams to describe Defendant's demeanor

when he interviewed him. Officer Williams stated that Defendant was tense, crying, and appeared upset. Officer Williams further testified that Defendant said he was responsible for Child's injuries and that "it was his fault."

{14} At the conclusion of the trial, Defendant moved for a directed verdict, arguing that, because Child was in the hospital for only two days he could not have suffered great bodily injury. The district court denied Defendant's motion. The prosecutor then gave his closing argument, during which he urged that: "[Child's injuries] are absolutely consistent with a man snatching that child by the arm and tossing him." Defendant made no objection to this statement. After hearing the evidence presented the jury returned a verdict of guilty.

**DISCUSSION**

**I.      The State Did Not Commit Prosecutorial Misconduct, Dr. Patterson's Testimony Was Not Unduly Prejudicial, and the District Court Did Not Err in Denying Defendant's Motion for a Mistrial**

{15} Defendant argues that he was deprived of a fair trial for three reasons. First, prosecutorial misconduct occurred when the prosecutor referred to a hypothetical scenario during Dr. Patterson's direct examination, during the period of the recording gap, and also in rebuttal during closing argument. Defendant contends that the prosecutor suggested that Defendant yanked Child's arm and threw Child against a wall, and that this inflamed the jury and prejudiced Defendant. Second, Defendant

8

argues that, again during the period of the recording gap, Dr. Patterson drew causal links between Child's injuries and child abuse and that this testimony improperly influenced the jury and prejudiced Defendant. Third, Defendant claims prosecutorial misconduct occurred when, during his opening statement, the prosecutor referenced the unrelated rib injury.

**A.     Standard of Review and Preservation of Error**

{16}     "[I]n reviewing claims of prosecutorial misconduct, we determine whether the trial court abused its discretion by denying a motion for a new trial based upon the prosecutor's conduct, by overruling the defendant's objection to the challenged conduct, or by otherwise failing to control the conduct of counsel during trial." *State v. Duffy*, 1998-NMSC-014, ¶ 46, 126 N.M. 132, 967 P.2d 807, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n. 6, 275 P.3d 110. "The rule in this [s]tate has consistently been that the admission of expert testimony or other scientific evidence is peculiarly within the sound discretion of the [district] court and will not be reversed absent a showing of abuse of that discretion." *State v. Alberico*, 1993-NMSC-047, ¶ 58, 116 N.M. 156, 861 P.2d 192. To preserve an issue for appeal, "a defendant must make a timely objection that specifically apprises the [district] court of the nature of the claimed error and invokes an intelligent ruling thereon." *State v. Montoya*, 2015-NMSC-010, ¶ 45, 345 P.3d 1056.

{17} For the sake of expediency and because it does not affect our decision, we will simply assume, without deciding, that Defendant preserved the claimed error regarding the hypothetical scenario and Dr. Patterson's testimony regarding the causal links between Child's injuries and child abuse during the period of the recording gap. Defendant concedes that he did not object to the hypothetical scenario that was posed during the State's closing argument and therefore he failed to preserve. As for Defendant's third argument, Defendant raised and preserved the issue of the unrelated rib injury when he objected to the State's opening statement and requested a mistrial that the district court subsequently denied. *Montoya*, 2015-NMSC-010, ¶ 45.

## B. The State's Hypothetical Scenario Did Not Amount to Prosecutorial Misconduct

{18} "It is well established in New Mexico that the appellant carries the burden of ensuring that the appellate court is provided with a complete record and transcript of proceedings sufficient to review the appellant's claims." *State v. Martinez*, 2002-NMSC-008, ¶ 48, 132 N.M. 32, 47, 43 P.3d 1042. *See* Rule 12-211(E) NMRA ("Each appellant shall be responsible for the timely preparation and filing of the transcript of proceedings."); *State v. Padilla*, 1980-NMCA-141, ¶ 7, 95 N.M. 86, 619 P.2d 190 (affirming second-degree murder conviction and stating that "[i]t is [the] defendant's burden to bring up a record sufficient for review of the issues he raises on appeal").

{19} When a recording of the proceedings is either totally or partially inaudible or unavailable,

> "Rule 12-211(H) . . . requires that the appellant prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection within fifteen (15) days after the filing of the taped transcript of proceedings in the appellate court or within thirty (30) days after service of the notice of a general calendar assignment, whichever is earlier."

*Martinez*, 2002-NMSC-008, ¶ 7 (alteration, omission, and internal quotation marks omitted). "[I]t is the appellant's responsibility to provide [the appellate] court with the record on appeal, and when a record is incomplete, [the appellate] court assumes that the missing portions would support the [district] court's determination." *Eldridge v. Aztec Well Servicing Co.*, 1987-NMCA-042, ¶ 7, 105 N.M. 660, 735 P.2d 1166. *See State v. Jim*, 1988-NMCA-092, ¶ 3, 107 N.M. 779, 765 P.2d 195 (holding that "[i]t is [the] defendant's burden to bring up a record sufficient for review of the issues he raises on appeal"). "Where there is a doubtful or deficient record, every presumption must be indulged by the reviewing court in favor of the correctness and regularity of the [district] court's judgment." *State v. Rojo*, 1999-NMSC-001, ¶ 53, 126 N.M. 438, 971 P.2d 829 (alteration, internal quotation marks and citation omitted). *See Jeantete v. Jeantete*, 1990-NMCA-138, ¶ 8, 111 N.M. 417, 806 P.2d 66 (holding for purposes of review that, absent evidence to contrary, appellate courts will presume that missing portions of record support trial court's ruling).

**{20}** When a defendant fails to recreate an unavailable transcript, or correct an erroneous transcript, this Court has declined to reach the issues. *State v. Ruiz*, 1995-NMCA-007, ¶ 20, 119 N.M. 515, 892 P.2d 962 (concluding that because the defendant did not avail himself of the methods by which erroneous transcripts may be corrected, or unavailable transcripts may be recreated, hearsay issue is not considered). *See G & G Servs., Inc. v. Agora Syndicate, Inc.*, 2000-NMCA-003, ¶ 17, 128 N.M. 434, 993 P.2d 751 (declining to reach the appellant's claim that jury instructions were improper when the instructions were not included in the record on appeal and the appellant failed to supplement or recreate a transcript of the instructions given).

**{21}** Defendant contends that the State posed the hypothetical scenario during the portion of the trial that was not recorded. Defendant has failed to recreate the unavailable portion of the transcript that he now relies on. *Ruiz*, 1995-NMCA-007, ¶ 20 (holding that if the defendant fails to recreate an unavailable transcript or correct an erroneous transcript this Court has declined to reach the issues). We therefore reject Defendant's argument regarding the claimed inflammatory hypothetical scenario on the basis of his failure to comply with Rule 12-211(H).

**{22}** In any event, even if we were to consider Defendant's argument it still fails because the prosecutor did not make any prejudicial statement that was not supported

by evidence. "It is misconduct for a prosecutor to make prejudicial statements not supported by evidence." *Duffy*, 1998-NMSC-014, ¶ 56 ("discussing professional standards proscribing questions not supported by evidence"). However, "[i]n the discretion of the [district] court, hypothetical questions may be posed to an expert witness." *State v. Begay*, 1998-NMSC-029, ¶ 25, 125 N.M. 541, 964 P.2d 102. "[H]ypothetical questions must be based on facts which are already in evidence or upon evidence which the questioner assures the court will be produced and is admissible in evidence." *Yardman v. San Juan Downs, Inc.*, 1995-NMCA-106, ¶ 37, 120 N.M. 751, 906 P.2d 742. In addition, Rule 11-705 NMRA states, "[u]nless the court orders otherwise, an expert may state an opinion—and give the reasons for it—without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination." *Id.*

{23}     The only evidence we have of the State's hypothetical scenario made during the period of the recording gap is from the transcript log which mentions the State commenting, "Grabbing the arm of the child and throwing him, It could account for part of the injuries, not account for bruising on the face or the healing rib fractures." The State's hypothetical scenario was based on the injuries that Child sustained that were consistent with the State's theory of the case, that Child's injuries were not caused by a fall from a couch as Defendant asserted. The State's hypothetical scenario

13

was supported by Dr. Patterson's testimony: she testified that in her opinion the hypothetical scenario posited by the State could account for Child's injuries and that, other than child abuse, she was not aware of any other diagnosis that could explain the totality of Child's injuries. Such opinion testimony is permissible. *See* Rule 11-705. The State used the fact of Child's constellation of injuries to argue that the injuries were caused by intentional child abuse. Thus, even if we were to review Defendant's claim, we perceive no error in permitting the State to refer to this scenario during its argument.

**C.      Dr. Patterson's Testimony Regarding the Cause of Child's Injuries Was Not Improper**

{24}      Next, Defendant argues that Dr. Patterson testified, "it is child abuse." Defendant states that this testimony also occurred during the portion of the trial that was not recorded. Citing *Alberico*, 1993-NMSC-047, ¶ 24, he contends that this amounted to an improper "definitive causal link[]" between Child's injuries and the child abuse by Defendant.

{25}      The only evidence we have of Dr. Patterson's statement is from the transcript log which mentions the State remarking, "Grabbing the arm of the child and throwing him. It could account for part of the injuries, not account for bruising on the face or the healing rib fractures," to which Dr. Patterson responded, "It is consistent with child abuse." Thus, Defendant again failed to recreate the unavailable portion of the

14

transcript that he now relies on, and the only available indication of Dr. Patterson's testimony does not support his position.

{26} Even if we were to consider Defendant's argument, it fails because the transcript log indicates Dr. Patterson testified that Child's injuries were "*consistent with child abuse*" and this type of testimony is permissible. *See Alberico*, 1993-NMSC-047, ¶ 103 (holding that an expert may testify that the complainant's symptoms are consistent with those suffered by someone who has been sexually abused). *See also State v. Wilson*, 2011-NMSC-001, ¶¶ 29-38, 149 N.M. 273, 248 P.3d 315 (holding that an expert's opinion that the victim's cause of death was consistent with smothering was admissible), *overruled on other grounds by Tollardo*, 2012-NMSC-008, ¶ 37 n. 6. We determine the district court did not abuse its discretion by allowing Dr. Patterson's testimony.

**D. The District Court Did Not Err in Denying Defendant's Motion for a Mistrial Because the Mention of the Broken Ribs Constitutes Harmless Error**

{27} Whether an error is harmless depends upon the reasonable possibility or reasonable probability that the error contributed to the conviction. *Tollardo*, 2012-NMSC-008, ¶ 45. In his opening statement the prosecutor referred to Child's broken ribs, which apparently occurred in a unrelated incident, when listing the injuries of Child, "[Child had a] broken arm, broken ribs, bruises on sides of his face,

15

skull fracture, swelling to his brain, bleeding in his brain, and hemorrhaging in his eyes." During the State's direct examination of Dr. Patterson the prosecutor asked Dr. Patterson about Child's rib fractures and she indicated that they were healing rib fractures. The state elected not to lay a foundation as the court instructed following defense counsel's objection, and the rib injuries were not mentioned again during the trial. Furthermore, the jury was instructed that opening statements are not evidence. We conclude that the limited reference to the broken ribs was harmless in view of Child's other significant injuries. Under these circumstances, the limited reference to the broken ribs did not unfairly prejudice Defendant and the district court did not err in denying his motion for a mistrial.

**II.     The District Court Did Not Err by (A) Instructing the Jury Regarding Intentional but Not Negligent (Based on Reckless Conduct) Child Abuse and (B) Including "Failure to Act" in the Definition for Intentional Conduct**

{28}    The State tendered the following instruction, which tracked the then-current version of UJI 14-602 NMRA (repealed April 3, 2015), on the elements of intentional child abuse resulting in great bodily harm:

> For you to find [Defendant] guilty of Child Abuse resulting in Great Bodily Harm, the State must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1.     [Defendant] caused [Child] to be placed in a situation which endangered the life or health of [Child];

16

2.      [D]efendant acted intentionally;

3.      [Defendant's] actions resulted in great bodily harm to [Child];

4.      [Child] was under the age of 18;

5.      This happened in New Mexico on or about the 20th day of December 2012.

Defendant tendered the same instruction in its entirety except with the following additional language in subsection 2, shown in italics:

2.      [D]efendant acted intentionally. *To find that* [*Defendant*] *acted with reckless disregard you must find that* [*Defendant*] *knew or should have known that* [D]*efendant's conduct created a substantial and foreseeable risk,* [D]*efendant disregarded that risk and* [D]*efendant was wholly indifferent to the consequences of the conduct and to the welfare and safety of* [*Child*].

(Emphasis added).

Defense counsel argued that Defendant's proposed instruction was appropriate, because it gave Defendant a "defensible position." The district court declined Defendant's request and gave the State's instruction to the jury.

{29}    In contrast, both the State and Defendant tendered an identical instruction defining intentional conduct:

A person acts intentionally when the person purposely does an act. Whether [Defendant] acted intentionally may be inferred from all of the surrounding circumstances, such as [D]efendant's actions or failure to act, conduct and statements.

17

UJI 14-610 NMRA (recompiled and amended as UJI 14-141 NMRA, effective April 3, 2015).

**{30}** On appeal, Defendant argues that the district court erred in (a) not submitting two separate instructions on the elements of child abuse based on intentional and reckless conduct and (b) not omitting the phrase "failure to act" from the instruction defining intentional conduct.

**A.    Standard of Review and Preservation of Error**

**{31}** The standard of review we apply to jury instructions depends on whether the issue has been preserved. If the error has been preserved we review the instructions for reversible error. If not, we review for fundamental error. Under both standards we seek to determine whether a reasonable juror would have been confused or misdirected by the jury instruction.

*State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (internal quotation marks and citations omitted). "The exacting standard of review for reversal for fundamental error requires the question of guilt be so doubtful that it would shock the conscience of the court to permit the verdict to stand." *State v. Cabezuela* (*Cabezuela II*), 2015-NMSC-016, ¶ 37, 350 P.3d 1145 (alterations, internal quotation marks, and citation omitted).

**{31}** Regarding his first argument, Defendant did not request two separate instructions for intentional and reckless child abuse, nor did he object to use of a

18

single elements instruction. Instead, he proposed an instruction that combined the two states of mind. We will assume without deciding that such a tendered instruction sufficed to preserve the error he now claims regarding the failure to separately instruct on intentional and reckless child abuse. Regarding his second argument, Defendant did not preserve the error. Indeed, Defendant submitted the same jury instruction defining intentional conduct that he now claims as error. Thus, we will review this argument for fundamental error. *Benally*, 2001-NMSC-033, ¶ 12.

**B.      No Fundamental Error Occurred When the District Court Did Not Submit Separate Instructions on Intentional and Reckless Disregard**

{32}      Several relatively recent New Mexico Supreme Court decisions have addressed when in a criminal child abuse case a district court must give separate intentional and negligent child abuse instructions. In *State v. Cabezuela* (*Cabezuela I*), the state charged the defendant with, and presented its case at trial on a single theory of, intentional child abuse resulting in death.  2011-NMSC-041, ¶¶ 16, 20, 27, 150 N.M. 654, 265 P.3d 705. The defendant's theory was that she was guilty of only negligent child abuse. *Id.* ¶ 34. The difference was material because the sentence for the former was life imprisonment (for a child under age twelve) and for the latter was eighteen years imprisonment. *Id.* ¶ 32. UJI 14-602 at the time required the jury to find, as elements of the crime, that the defendant "acted intentionally" and that "[the defendant's] actions *or failure to act* resulted in the death of [the child]." *Cabezuela*

19

*I*, 2011-NMSC-041, ¶ 18 (emphasis added). Our Supreme Court held that this misstated the governing statute, Section 30-6-1. *Cabezuela I*, 2011-NMSC-041, ¶ 36. Further, the "failure to act" language "aligns with a negligen[ce] theory of child abuse." *Id.* ¶ 33. As a result of both the misstatement of the law and the absence of a separate instruction articulating a negligence child abuse theory, and in light of the defendant's negligence defense, the jury would have been misdirected and/or confused. *Id.* ¶ 36. The court accordingly reversed the intentional child abuse conviction and remanded for a new trial.

{33} In *State v. Consaul*, the state charged the defendant on alternate theories of intentional or negligent child abuse resulting in great bodily harm. 2014-NMSC-030, ¶¶ 13-14, 332 P.3d 850. At the close of evidence, the defendant requested separate jury instructions and verdict forms for each of the two theories, but the district court declined and gave a single instruction and verdict form that combined the two elements. *Id.* ¶ 16. On appeal following the defendant's conviction, *id.* ¶ 18, the Supreme Court concluded that the jury should have received separate jury instructions, although for reasons different than those discussed in *Cabezuela I*. *Consaul*, 2014-NMSC-030, ¶ 19. The Court noted that in *Cabezuela I*, the defendant was charged with intentional child abuse resulting in *death*, and the punishment for that crime (where the child is under age twelve) was greater than the punishment

where the mental state is only negligence. *Consaul*, 2014-NMSC-030, ¶ 22. In contrast in *Consaul*, where the crime at issue was child abuse resulting in great bodily harm, the punishment was eighteen years whether the defendant's mental state was intentional or negligent. *Id.* ¶ 23. Notwithstanding this lack of difference in penalty:

> [w]hen two or more different or inconsistent acts or courses of conduct are advanced by the [s]tate as alternative theories as to how a child's injuries occurred, then the jury must make an informed and unanimous decision, guided by separate instructions, as to the culpable act the defendant committed and for which he is being punished.
>
> . . . .
>
> The jury needs to agree unanimously on what conduct caused harm to the child.

*Id.* ¶¶ 23, 25. Because the jury could have found guilt without necessarily agreeing on what conduct the defendant engaged in, the Court reversed the conviction. *Id.* ¶ 25.

**{34}** In *State v. Montoya*, the defendant was charged with intentional or negligent child abuse resulting in the death of a child under age 12. 2015-NMSC-010, ¶ 14, 345 P.3d 1056. Rather than give separate instructions for both intentional and negligent child abuse, the district court gave a single instruction regarding the elements of the crime, *id.* ¶ 21, but then also gave a "step-down" instruction that directed the jury on the use of separate special interrogatories for determining if the defendant was guilty of intentional versus negligent child abuse. *Id.* ¶ 22. The Supreme Court affirmed, *id.* ¶ 34, holding that this was a acceptable way to avoid juror confusion: "We held in

21

*Cabezuela* [*I*] that separate instructions are one way to achieve [clear jury instructions with respect to the defendant's mental state]. [T]he district court's approach in this case was similarly effective[.]" *Id.* ¶ 32. The Court also stressed the significance of the distinction between the punishments for intentional and negligent child abuse resulting in death of a child under age twelve:

> [W]hile the distinction between reckless and intentional conduct was critical in this case, that distinction is often immaterial when the child abuse does not result in the death of a child under twelve. . . . [I]n most cases when the abuse does not result in the death of a child under twelve, it is not necessary to specify the defendant's mental state or to provide separate jury instructions for reckless or intentional conduct[.]

*Id.* ¶ 33.

{35} Here, Defendant was convicted of intentional child abuse resulting in great bodily harm. As noted in *Montoya*, when the abuse does not result in the death of a child under twelve, it generally is not necessary to provide separate jury instructions for intentional or reckless conduct, because the punishment is the same for both crimes. Further, unlike *Consaul,* here the State advanced only one theory—intentional child abuse—and Defendant's theory of the case was not that he was negligent but that Child's injuries resulted from either an underlying condition or a fall from the couch to the hard floor. For this reason, there was no risk of juror confusion resulting from the failure to instruct on the elements of negligent child abuse. Indeed, having only one instruction on the theory that the State advanced likely mitigated the

22

possibility of juror confusion that having two separate instructions could have caused. For these reasons, we determine there was no error in submitting one instruction on intentional child abuse.

**C.     No Fundamental Error Occurred When the District Court Included "Failure to Act" in the Instruction Defining Intentional Conduct**

{36}     In *Cabezuela II*, the Supreme Court reviewed the instructions that the district court gave the jury at the conclusion of the trial that followed the reversal and remand in *Cabezuela I*. During the second trial, the state again pursued a theory of intentional, and not negligent, child abuse resulting in death; the defendant's theory again was that she was guilty only of negligent child abuse. *Cabezuela II*, 2015-NMSC-016, ¶ 33. The district court gave a separate step-down instruction on negligent child abuse and did not include failure-to-act language in its instruction on the elements of intentional child abuse. *Id.* ¶¶ 33-34. However, the district court gave the jury the same UJI 14-610 instruction on the definition of intentional conduct that was given in the case at bar. *Id.* ¶ 35. The defendant challenged the definition instruction on the grounds that it included the phrase "failure to act," citing the concerns articulated in *Cabezuela I* regarding these words' potential for causing jury confusion in the context of a prosecution for intentional child abuse. *Id.* ¶¶ 36, 38, 40. The Court acknowledged the "greater clarity" that resulted from the removal of this phrase from the new definition of intentional conduct that was effective for cases pending or filed after April 3, 2015.

23

*Id.* ¶ 42. However, the Court concluded that giving the instruction did not amount to fundamental error. "In this case, where the [s]tate's theory was based entirely on evidence of what [the d]efendant did, not on what she did not do—a theory amply supported by substantial trial evidence—we fail to find any significant risk of jury confusion, substantial injustice, or a doubtful verdict." *Id.* ¶ 43.

{37}     The case at bar can be resolved on the same basis. Like *Cabezuela II*, including "failure to act" in the jury instruction does not shake our confidence in the jury verdict. We find no fundamental error in the district court allowing "failure to act" in the language of the jury instruction defining intentional.

**III.     Sufficient Evidence was Presented Supporting Defendant's Conviction of Intentional Child Abuse**

{38}     Defendant argues that (a) Dr. Patterson impermissibly testified to Child's injuries that "it is child abuse," and without this testimony the State did not have sufficient evidence that Defendant caused Child's injuries; (b) the State did not prove beyond a reasonable doubt that there had been great bodily harm.

**A.     Standard of Review and Preservation of Error**

{39}     Appellate courts "review sufficiency of the evidence from a highly deferential standpoint [and a]ll evidence is viewed in the light most favorable to the state, and we resolve all conflicts and make all permissible inferences in favor of the jury's verdict." *State v. Slade*, 2014-NMCA-088, ¶ 13, 331 P.3d 930 (alterations, omission, internal

24

quotation marks, and citation omitted). The test to determine the sufficiency of evidence in New Mexico is:

> whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction. We have explained that this test involves two separate parts. First, a reviewing court must view the evidence in the light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict. Second, an appellate court determines whether the evidence, *viewed in this manner*, could justify a finding by *any* rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt. . . . Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*State v. Graham,* 2005-NMSC-004, ¶¶ 6, 7, 137 N.M. 197, 109 P.3d 285 (emphasis in original) (alterations, omission, internal quotation marks, and citations omitted). "[W]hen there is a conflict in the testimony, we defer to the trier of fact." *Buckingham v. Ryan*, 1998-NMCA-012, ¶ 10, 124 N.M. 498, 953 P.2d 33. Thus, "[c]ontrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts." *Rojo*, 1999-NMSC-001, ¶ 19.

{40}     Defendant concedes that he did not preserve the claimed error as to his first argument. Defendant argues it is of constitutional importance and should thus be reviewed regardless of preservation. We do not conclude that this issue rises to the level of constitutional importance and therefore decline to address this argument. Defendant preserved the claimed error on appeal as to his second argument when he

unsuccessfully moved for a directed verdict, arguing that the State did not meet its burden of proving great bodily harm. *Montoya*, 2015-NMSC-010, ¶ 45.

**B.      The State Proved Great Bodily Harm Beyond a Reasonable Doubt**

{41}      To convict Defendant, the State was required to prove, among other elements, that Defendant's actions resulted in great bodily harm to Child. *See* UJI 14-615 NMRA. "Great bodily harm means an injury to a person which creates a high probability of death . . . or results in loss of any member or organ of the body or results in permanent or prolonged impairment of the use of any member or organ of the body." UJI 14-131 NMRA (alterations omitted). In *State v. Robinson*, this Court held that there was sufficient evidence of great bodily harm where the child suffered a skull fracture, and this fact combined with other evidence "permitted a rational inference . . . that [the child's] injuries created a high probability of death." 1979-NMCA-001, ¶ 22, *overruled on other grounds by Santillanes v. State*, 1993-NMSC-012, 115 N.M. 215, 849 P.2d 358.

{42}      Dr. Patterson testified to the extent of Child's injuries. Dr. Patterson described Child's injuries as "bruising, swelling on the right side and back of his head, a CT scan showed a skull fracture on the right side back of his head, bleeding inside his head around his brain, he had a fracture on the elbow that required surgery." She further testified that these injuries could have caused death and that it requires significant trauma to cause a bleed in the brain. This evidence was sufficient to

26

support a finding by a rational trier of fact that Child suffered great bodily harm beyond a reasonable doubt.

**IV.** **Because Only One Instance of Harmless Error Occurred, the Doctrine of Cumulative Error Fails. Furthermore, the Error in the Recording Equipment Does Not Entitle Defendant to a New Trial**

{43} Defendant argues that cumulative error denied him a fair trial and the portion of the recording gap also entitles Defendant to a new trial.

**A.** **Standard of Review and Preservation of Error**

{44} "The doctrine of cumulative error requires reversal when a series of lesser improprieties throughout a trial are found, in aggregate, to be so prejudicial that the defendant was deprived of the constitutional right to a fair trial." *Duffy*, 1998-NMSC-014, ¶ 29. The cumulative error doctrine is strictly applied, and may not be successfully invoked if the record as a whole demonstrates that the defendant received a fair trial. *State v. Trujillo*, 2002-NMSC-005, ¶ 63, 131 N.M. 709, 42 P.3d 814. "Where there is a doubtful or deficient record, every presumption must be indulged by the reviewing court in favor of the correctness and regularity of the [district] court's judgment." *Rojo*, 1999-NMSC-001, ¶ 53 (alteration, internal quotation marks and citation omitted). We will assume without deciding that Defendant preserved the claimed error regarding the recording gap and the issue of cumulative error.

**B.** **Analysis**

**{45}** Viewing the record as a whole, it is clear Defendant received a fair trial. Any error made by the district court was too slight to have the cumulative effect of denying Defendant a fair trial. The only evidentiary error occurring in this case was harmless error, and therefore we conclude that there was no cumulative error.

**{46}** Further, by failing to comply with Rule 12-211(H), Defendant waived any claim regarding the completeness of the record. *See Martinez*, 2002-NMSC-008, ¶¶ 51-52 (holding the defendant has a duty to supplement the missing portions of the record and is not entitled to a new trial, because of the absence of a vital portion of the record, without first having attempted to supplement the record). A party may not seek a new trial simply because matters occurring in the district court are not reflected in the transcript; rather, that party must at least attempt to cure the defect by reconstructing the record. *Id*.

**{47}** Indeed, as we have accepted Defendant's version of what the missing audio would contain and still perceive no error, we determine Defendant suffered no prejudice by the recording discrepancy. Therefore, he is not entitled to a new trial. *See State v. Fernandez*, 1994-NMCA-056, ¶ 13, 117 N.M. 673, 875 P.2d 1104 (noting that "in the absence of prejudice, there is no reversible error").

**CONCLUSION**

**{48}** We affirm Defendant's conviction of intentional child abuse resulting in great bodily harm, contrary to Section 30-6-1.

28

{49}     **IT IS SO ORDERED.**

_____
**HENRY M. BOHNHOFF, Judge**

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Judge**

_____
**J. MILES HANISEE, Judge**

29